## J. F. TORLADÉ D'AZAMBUJA, CHARGÉ D'AFFAIRES OF HIS MOST FAITHFUL MAJESTY THE KING OF PORTUGAL NEAR THE UNITED STATES V. JOACHIM BARROZO PEREIRA.

March 20, 1830.

### *Rule to show cause why the process issued should not be quashed.*

B. P. was the chargé d'affaires of Portugal near the United States, appointed by the princess Donna Isabel Maria, as president of the regency constituted by king John VI., and was duly recognized by this government. On the 18th of July 1828, in consequence of certain decrees of the regent Don Miguel, which he considered an infraction of the authority of Don Pedro as king, he advised the department of state, by letter, that he ceased his diplomatic functions, which letter was put on file ; but on the 25th of August 1828 he also communicated to the said department that a provisional junta had been installed at Oporto to maintain the authority of Don Pedro as king of Portugal, and that he resumed his diplomatic functions, which communication he was informed would be laid before the secretary, who was then absent, on his return. No other communication passed between the department and B. P., except an invitation of the latter by circular to attend the inauguration of the president. On the 30th of August 1828, T. A. presented to the department credentials as chargé d'affaires of Portugal near the United States, *appointed by the regent Don Miguel.* These being deemed insufficient by the department, new credentials of a similar character were presented, and on October 2d, 1829 he was received and recognised. On October 3d, 1829, B. P. communicated to the department that his functions thereby ceased, returned his *exequatur* and obtained his passports, in which he was styled as " having long resided near the government of the United States as chargé, &c. of Portugal." T. A., *as chargé, &c. of Portugal*, brings trover against B. P. for the archives and documents of the diplomatic mission. *Held*, that the defendant was entitled to *privilege* as a returning minister, and that the process should be quashed.

1. That the recognition of a foreign minister by the government of the United States is conclusive evidence of the authenticity and validity of his credentials, and its official acts are conclusive evidence as to whether he is a *returning* minister or not.

2. Where the minister announces to the government of the United States that his diplomatic functions have ceased by virtue of the termination, in fact, of the government which appointed him, and subsequently a minister appointed by the new foreign government is duly recognised, upon which the government of the United States grants a passport to the first, styling him as " having resided near, &c. the United States as chargé, &c.," his privilege as a returning minister has not been waived.

3. A suit brought by the newly appointed diplomatic agent, *as chargé d'affaires*, against the agent thus superseded, is not evidence that the sovereign of the foreign country has deprived the latter of his privileges (*quære* if the sovereign has the power to do so?), and such suit does not, *ipso facto*, divest the defendant of the privileges attached to him as a returning minister.

[Torladé v. Barrozo.]

THIS was an action of *trover* for certain archives and documents. The case came before the court on a rule to show cause of action, and why the defendant, claiming privilege as chargé d'affaires of the kingdom of Portugal, should not be discharged from the process issued against him.

It appeared that the defendant had been, at the suit of the plaintiff, held to bail in the sum of 100,000 dollars; and that, without making any effort to obtain bail, he had gone to prison and remained there until the next morning, when this application was made to the court for his discharge. The plaintiff's *affidavit* stated " that he was the duly accredited and recognised representative of the king of Portugal, and now the only diplomatic agent of the said king in the United States; that, as such, the archives of the diplomatic mission, and other documents of great importance to the interest of his most faithful majesty, and of certain of his subjects, of right belonged to him, and that the defendant had, and still retained in his possession, the said archives and documents, and had refused to deliver them to the plaintiff; that they were of greater value than 100,000 dollars, and that the defendant was about to depart from the United States."

The defendant had been chargé d'affaires of Portugal near the United States, and, as such, had been entrusted with the documents in question. Owing to changes which had taken place in that kingdom, he had ceased his functions, and demanded and received his passports to leave the country, and now claimed his privilege, as minister, to be exempted from arrest or suit of any kind. The plaintiff offered to prove by his own oath, the circumstances of the defendant's residence here, and the cessation of his functions as minister—depriving him of his title to this exemption; but the court said that the department of state was the only competent source of evidence of these facts, and therefore refused to receive the plaintiff's testimony.

After some discussion, the court discharged the defendant on common bail, on the ground that *the plaintiff had not shown sufficient cause of action*, reserving the question of *privilege* for future determination; and the case now came on for a final hearing.

The following facts appeared.

By a certificate obtained from the department of state at Washington, it appeared that on the 9th of June 1826, Mr Barrozo Pereira presented his credentials as chargé d'affaires of Portugal near the United States, appointed by the princess Donna Isabel Maria, as

[Torladé v. Barrozo.]

president of the regency constituted by a decree of the late king John VI. to administer the kingdom of Portugal during his illness, and was duly recognised in that character. Mr Barrozo had, previously thereto, held the same office *ad interim*, under an appointment of king John, as also that of consul-general, which latter he retained in conjunction with that of chargé d'affaires. Several communications were received from Mr Barrozo in his character as chargé d'affaires, and on the 18th of July 1828 he communicated to the department of state two decrees of the regent Don Miguel, which he considered as direct infractions of the Portuguese constitution, and of the authority of Don Pedro as king ; in consequence of which, he felt himself under the necessity of thenceforth ceasing his diplomatic functions as agent of the government of Portugal. On the 28th of July, Mr Barrozo was informed by Mr Brent, the chief clerk, that his letter had been laid before the president, and filed in the department, as evidence of " the important step which he had taken." On the 25th of August 1828, Mr Barrozo informed the secretary of state that a provisional junta had been installed at Oporto, for the purpose of maintaining the legitimate authority of Don Pedro as king of Portugal, and that he felt it his duty to resume his diplomatic functions as the representative of the legitimate government of Portugal ; stating, that by ceasing his diplomatic functions, as before announced, he did not consider himself as ceasing to be chargé d'affaires of his most faithful majesty. This note was received at the department during the absence of the secretary, and Mr Barrozo was informed that it would be submitted to him on his return to Washington. On the 6th and 27th of November 1828, Mr Barrozo sent communications to the department, still styling himself chargé d'affaires of Portugal. These remained unanswered, and the only communication which was made by the department to Mr Barrozo, as charge d'affaires of Portugal, subsequently to his note of the 18th of July 1828, was a circular, written by Mr Brent, to all the members of the diplomatic corps, inviting them to attend the inauguration of the president elect. This note was dated 3d March 1829. Since the accession of the newly elected president, no official communication had been made to, or received from Mr Barrozo as chargé d'affaires ; and on two occasions, when circular letters were addressed by the department to the members of the diplomatic corps, Mr Barrozo was omitted. From informal conversations with him, the secretary of state understood it to be Mr Barrozo's inten-

[Torladé v. Barrozo.]

tion to await, in this country, the result of events at home, and the decision of this government upon the recognition of the new diplomatic representative of Portugal.

On the 30th August 1828, Mr Torladé d'Azambuja presented himself at the department of state, and delivered there his original letter of credence as chargé d'affaires of Portugal near the United states, appointed by the infant regent Don Miguel. This letter which was dated 31st March 1828, was returned to him at the same interview at which it was presented. The change which had taken place in the government of Portugal, rendered it necessary that Mr Torladé should present new credentials, and his reception was therefore delayed. On the 18th April 1829, Mr Torladé communicated to the secretary of state a copy of his new credentials, dated the 23d December 1828, introducing Mr Torladé as appointed by his most faithful majesty (Don Miguel), chargé d'affaires of Portugal near the United States; and requested that a time should be designated at which he might present the original. This, and other communications from Mr Torladé on the same subject, remained unanswered, until on the 1st October 1829 he was informed by the secretary of state that he would be received on the following day; and, accordingly, on the 2d of that month, he was received and recognized as chargé d'affaires of the Portuguese government.

On the 3d of October 1829, Mr Barrozo, as consul-general of Portugal, addressed a communication to the department of state, expressing his regret at the recognition by the United States of the government of Don Miguel; at the same time announcing the cessation of his consular functions, returning his *exequatur*, and requesting his passports, which were sent him on the 8th October, and in which he was styled as "having long resided near the government of the United States as chargé d'affaires, and consul-general of Portugal."

This certificate, together with copies of the documents referred to, was transmitted to the district attorney of the United States for this district, with instructions to produce them in court, for the use of all parties; and, accompanying it, was sent an opinion of the attorney-general of the United States, taken by order of the president, stating that upon the facts as certified from the department of state, he considered the defendant entitled to the privilege he claimed. The secretary, at the same time, wrote to the defendant, stating what had

I.—2 w

been done, and hoping that he would be satisfied with the course pursued by the government.

*Philips, J. R. Ingersoll* and *Sergeant,* for the plaintiff, contended, that the defendant was not entitled to the privilege he demanded. Admitting that all foreign ministers are entitled to personal privilege to a large extent, not only while in the actual exercise of their functions but for a reasonable time after their official character has terminated, they insisted that this privilege is not perpetual ; that the acts of the executive branch of the government, in commencing, continuing and terminating the functions of foreign ministers, are conclusive upon the courts ; that they may be terminated without any particular form ; and that the appointment of a new minister is an unequivocal recall of the old one. This was precisely the case with Mr Barrozo. He was appointed by the regent Donna Isabella, in March 1826, and continued for some time to be the diplomatic representative of Portugal, when concurrent acts of the minister, the Portuguese government and that of the United States, all uniting in putting an end to his functions, they necessarily ceased. On the 18th July 1828, he renounced his functions as chargé d'affaires, in consequence of what he considered the usurpation of Don Miguel, since which time he has had no diplomatic character. His communication to the department of state of the 25th August 1828, did not restore his official character ; because, even if he had the right to renounce and resume his functions at pleasure, which was doubtful, he then claimed to represent the government of Don Pedro, who had never appointed him, and who never has been recognised by the United States as the sovereign of Portugal. His subsequent attempt to be considered the representative of Donna Maria da Gloria, queen of Portugal, is equally objectionable, since no such government has ever been known or recognised by the executive of this country, whose acts in these matters must be conclusive upon the court. This is evident from his letter to the secretary of state, of 3d October 1829, in which he styles himself consul-general only, and refers to the 18th July 1828, as the time when his diplomatic functions ceased. Such, also, must have been the opinion of our own government, since, during all that time, they did not, in any instance, treat with Mr Barrozo, as a diplomatic agent ; and it was only in the kind of *interregnum* which occurred between the going out of the old, and the coming in of the new administration, that Mr Brent addressed to him the circular inviting him to the inauguration of the president ; where-

[Torladé v. Barrozo.]

as, on two subsequent occasions, when the diplomatic corps was addressed from the department of state, he was omitted; and his passport, given the 8th October 1829, though it recognises the station he formerly held, is such as would be given to any citizen, and asks for him no diplomatic privilege.   Another strong evidence of the sense of our government was to be found in the fact, that it had not interfered by its legal officer to vindicate its own law and the law of nations, alleged to have been violated in the person of Mr Barrozo. On all former occasions when the privilege of a foreign minister has been invaded, the government has come forward to protect him in the enjoyment of his rights; but in this instance the defendant is left to take care of himself, with only a certificate from the department of state, which is to be laid before the court for the benefit of both parties.

On the whole, it appeared that Mr Barrozo, being in this country as consul, was appointed chargé d'affaires, first by king John VI., and afterwards by the regency constituted by that monarch; that he was so recognised by this government, and held both these stations until the 18th of July 1828, when he renounced his diplomatic functions, and continued as consul-general; that on the 25th of August 1828, he declared his wish to resume his functions as diplomatic agent of a power never recognised by the United States; that on the 3d of October 1829, he explained his act of the 18th of July 1828 to have been a cessation of his *diplomatic* functions, and a mere continuance of his consular character, which, also, he then renounced; that during all the time since the renunciation of the 18th of July 1828, the recognised government of Portugal has expressed no desire to assert or maintain Mr Barrozo's privilege; and the government of the United States has never recognised Don Pedro as king of Portugal, whose representative the defendant claims to be.

On this hearing, the propriety of the suit was not in question; the claim of privilege only was before the court; and in deciding that, the court ought to decide on the facts certified by the department of state, without regard to the opinion of the attorney-general which accompanied it.   It did not become the dignity of the court to sit for the registry of the edicts of an attorney-general, even if that were attempted.   The officer himself merely gives his opinion in compliance with the request of the president; his opinion is therefore entitled to no more authority than the reasons upon which it is founded may possess.

[Torladé v. Barrozo.]

The defendant claims this privilege as chargé d'affaires of Portugal; but he avows at the same time that he is going to England, not to Portugal, to render an account of his mission to the minister of the queen of Portugal; a power which does not exist, and therefore, by his own showing, his claim is unfounded. The principle on which the privileges of foreign ministers rested, was *policy*, not *hospitality*; and that policy would not permit a minister, who renounced and abjured his sovereign, to claim privilege against him. But whatever time might be allowed a minister to leave the country, it must have some limit. Six months have been fixed by some writers on the laws of nations; but here the defendant had remained eighteen months since his diplomatic functions had ceased; and he himself, his sovereign, and the government near which he was accredited, have all concurred in terminating his official character. This is the first instance of a minister claiming privilege against his sovereign, in whose name the claim is and must be made. The exemption from jurisdiction is a privilege of the sovereign, not of the minister. It does not depend on him to assert or to waive it: but the sovereign may waive it if he think proper. In this case the government of Portugal is the rightful sovereign of the defendant; and, in fact, the present claim of the defendant is made in the name of that government; but the only recognised, and therefore, as far as this court can know, the only government of Portugal, so far from desiring this privilege to be extended to the defendant, appears before the court by its representative, as plaintiff, insisting that Mr Barrozo should not be allowed this exemption. To allow it under such circumstances would be to give to a servant, in opposition to his master, a privilege which he can only claim as the representative of that master.

*C. J. Ingersoll* and *Chauncey*, for the defendant, in reply, protested against the government of Portugal being considered a party to this suit. It was a suit between individuals, and the court could know nothing beyond that, unless by an inquiry into the merits of the action. If any strength could be derived from that source, the king of Portugal should have appeared as plaintiff. That, however, could make no difference. The simple question before the court was, whether Mr Barrozo was entitled to the privilege of a foreign minister, no matter who might attempt to violate it? In determining this question, the court was bound to follow the decision of the executive of our government,—and that decision was in favour of

[Torladé v. Barrozo.]

the defendant.    This appeared both by the acts of the government towards Mr Barrozo, and by the communication made to the court by the secretary of state.    The opinion of the attorney-general was not a mere argument in favour of the defendant's claims.    It was the deliberate opinion of the highest law officer of the government, taken by direction of the president of the United States, adopted by him, and transmitted to the court as the decision of the executive department of this government, with whom, it is admitted, the right to decide upon the defendant's official character resides.    This was conclusive upon the court, and ought to preclude further discussion, and was, moreover, a complete answer to the argument of the plaintiff's counsel, that the government had not interfered in this as in other cases, to protect the privileges of foreign ministers; for here was all that could be asked from our government; an express decision of the executive, that the defendant is entitled to the privilege transmitted to the district attorney of the United States, who was directed to present it in person to the court.    But, besides this, the defendant's claim of privilege was supported by the facts before the court.    That he was once a minister is certain; and this being established, it was for the plaintiff to show that he has forfeited the privileges belonging to that character.    It had been said that he renounced his diplomatic character by his note of the 18th of July 1828, but that is a mistake.    In the first place it is extremely doubtful whether a minister can resign without the consent of his sovereign, though he may suspend the active exercise of his functions; and, in the next place, Mr Barrozo never attempted to resign. He only ceased his functions; and when, in the following month, he communicated to the department of state his intention to resume his functions, he expressly declared that he did not consider himself as having, by his former note, divested himself of his character of chargé d'affaires of Portugal.    Subsequently to this, the government of the United States received from him, without objection, communications made in his official character, and addressed to him the note of the 3d of March 1829, as chargé d'affaires.    This, it was said, was by a clerk in the department during an *interregnum*; but besides the chief clerk's being an experienced officer, and having authority at that time, the act had been approved and adopted by the present secretary, who in his certificate to this court calls it *a communication from the department.*    That the defendant was omitted on two other occasions might have been owing to his absence from

[Torladé v. Barrozo.]

Washington, or some other circumstance not affecting the merits of the present question. The passport too, given on the 8th of October 1829, a short time previous to the arrest, recognises his diplomatic character, in a manner it would not have done, if the executive had not considered him entitled to the privileges of a foreign minister. With regard to the defendant, he never ceased to consider himself as a diplomatic functionary, from the time he was accredited as chargé d'affaires, in June 1826, until the recognition of Don Miguel as king, by the United States, on the 2d of October 1829 ; and although he suspended his diplomatic functions in July 1828, he resumed them in the following month, and always when he had occasion to make any communication to the department of state, it was as chargé d'affaires. The disturbed state of Portugal caused difficulty and hesitation on the part of our government ; and, perhaps, during the unsettled state of parties there, the executive of the United States avoided a declaration in favour of either ; but during that time Mr Barrozo had a right to remain here, awaiting the result of the struggles at home and hoping that that which he considered the legitimate party might prevail, and retain all the privileges of his diplomatic character ; and it was not until this government recognised Don Miguel as king, by receiving his representative, that Mr Barrozo saw his hopes disappointed, and then he immediately demanded his passport to return. It had been said that the privileges of foreign ministers are not personal, but given in right of the sovereign, and therefore when he does not assert them, and still more when he opposes them, as in this case, the minister has no right to them. But however this may be in general, it is evident this is not the ordinary case of one minister superseded by another from the same government, although even then, the superseded minister is entitled to return unmolested. But here a change of dynasty has taken place in the foreign country, and it would be monstrous to permit the newly received minister to assail the former one and deprive him of the privileges of his official character, under the pretence that the government is the same.

There is no doubt that the defendant had been invested with the sacred character of a foreign minister, which he asserts he maintained until the 2d of October 1829, a short time previous to the arrest, which, in that case, would be clearly illegal. But even if his diplomatic character had ceased at an earlier period, he was entitled to the protection of that character, during a reasonable time, for his return ; and the court could not prescribe the time to be allowed for

[Torladé v. Barrozo.]

this purpose. It is impossible for the judiciary to say when a minister tarries too long after the termination of his mission. The settlement of the affairs of his mission ; the state of his own government; the situation of that near which he is accredited ; and a variety of other causes, of which the judiciary can take no cognizance, may render it proper for him to remain ; and while he does so remain, the law of nations secures to him the immunities of his diplomatic character. Nor has the court any right to inquire whither he is going. He has a right to go where he pleases, being responsible to his own sovereign only for his conduct ; and whether he is going to England, or Portugal, or Brazil, he has a right to depart unmolested. The law of nations, for reasons of general policy, has invested foreign ministers with a sacred character, and conferred on them privileges which ought to be most carefully preserved ; and the act of congress passed to enforce the law of nations in this particular, besides inflicting a severe penalty on those who violate it, declares all process against a foreign minister null and void. In this case there has been a gross violation of the law of nations in the arrest and imprisonment of Mr Barrozo, who now claimed the benefit of the act of congress in quashing the process against him.

The following authorities were cited and commented on during the argument of the counsel on either side, viz. : 1 *Com. Dig.* 573 ; Dupont *v.* Pichon, 4 *Dall.* 321 ; *Const. U. S.*, art. 3, sect. 2 ; United States *v.* Ortega, 11 *Wheat.* 473 ; Rose *v.* Himely, 4 *Cranch* 292 ; Gelston *v.* Hoyt, 3 *Wheat.* 324 ; United States *v.* Palmer, *Ibid.* 634 ; The Divina Pastora, 4 *Wheat.* 52 ; United States *v.* Ortega, 4 *Wash. C. C. Rep.* 536 ; *Cases Temp. Talbot* 280 ; Marshall *v.* Cretico, 9 *East* 447 ; Clark *v.* Cretico, 1 *Taunt.* 106 ; Viveash *v.* Becker, 3 *Maule & Selw.* 296 ; *Vattel's L. N.*, b. 4, ch. 8, sect. 111, p. 489 ; 2 *Burlamaqui* 253, 254 ; *Ibid.* sect. 11, p. 251 ; *Vattel's L. N.*, b. 4, ch. 7, sect. 92, p. 471 ; *Vattel's L. N.*, b. 4, ch. 7, sect. 103, p. 483 ; *Vattel's L. N.*, b. 4, ch. 8, sect. 110, p. 489 ; 2 *Rutherforth* 275, 276, 574 *et seq.* ; *Molloy*, ch. 10, pl. 20, sect. 10, 11, 12, 13, 14, pp. 137, 139, 140 ; 1 *Wicquefort* 822, 823, 836, 837, 841, 82 ; 1 *Kent's Comm.* 170 ; 4 *Inst.* 152, 153 ; 2 *Viner, tit. Ambassador*, a., pl. 5, p. 287 ; King *v.* Creevy, 4 *Hall's Law Journal* 623 ; Seacomb *v.* Bowlney, 1 *Wils.* 20 ; Malachi Carolina's Case, 1 *Wils.* 78 ; Darling *v.* Atkins, 3 *Wils.* 33 ; Triquet *v.* Bath, 3 *Burr.* 1478 ; Heathfield *v.* Chilton, 4 *Burr.* 2016 ; Delvallo *v.* Plomer, 3 *Camp. Rep.* 46 ; Novello *v.* Toogood, 8 *Eng.*

[Torladé v. Barrozo.]

*C. L. Rep.* 149, (1 *Barn. & Cress.* 554) ; Poiter v. Croza, *1 Bl. Rep.*
48 ; Act of Congress, April 30, 1790, *sect.* 27, *Ingersoll's Dig.* 160 ;
United States v. Hand, 2 *Wash. C. C. Rep.* 438 ; *Marten's Man.
Dipl.* 16, 43, 133 ; *Bynkershoek, Du Juge Comp.* 5, *sect.* 6 ; 2 *Grotius* 400, *b.* 2, *ch.* 18 ; 2 *Grotius* 408, *sect.* 5, 6, *art.* 6 ; *Vattel, b.* 4, *ch.*
5, *sect.* 62, *p.* 455.

The opinion of the Court (BARNES, *President* ; HALLOWELL, J. ;
and COXE, J.) was delivered by

COXE, J.—A rule upon the plaintiff to show cause of action, and
why the defendant, claiming privilege as chargé d'affaires of the
kingdom of Portugal, should not be discharged from the process is-
sued against him, having been allowed, after a hearing before a sin-
gle judge, the defendant was discharged on common bail, and the
remainder of the rule reserved for the determination of the court in
bank. The reasons for the discharge of the defendant on common
bail were expressed by the judge at the time it was ruled, and being
altogether unconnected with the question of *privilege*, it will be un-
necessary for the court here to advert to them. The single question
now to be determined is, Has the defendant established his claim of
privilege as chargé d'affaires of the kingdom of Portugal, so as to
entitle him to be discharged from the process issued against him ?

That foreign ambassadors and other public ministers, including
the grade of chargé d'affaires, are invested with an inviolability of
character, immunities and privileges, exempting their persons and
their property from the jurisdiction and authority of the state near
which they reside, by the laws of nations and the statutes of our
country, cannot be a subject of debate. Under ordinary circum-
stances it would appear that we have rather to determine a ques-
tion of fact, viz. : is the defendant invested with the diplomatic
character he alleges ; and not, whether, being chargé d'affaires of a
foreign government, he is privileged from arrest and suit. Many
objections have been made to the claim of privilege, and we shall
notice such of them as a fair discussion of the case may seem to
require.

Before entering upon the consideration of the testimony, it is to
be remarked, that facts and papers have been referred to during the
argument which the court do not consider legal evidence ; and points
of law relating to evidence have been raised, which we are not called
upon to determine. The constitution of the United States having

[Torladé v. Barrozo.]

made it the duty of the president " *to receive foreign ambassadors and other public ministers,*" it would appear, and it has been judicially determined, that it has necessarily bestowed upon the executive branch of the federal government the exclusive right to judge of the credentials of the ministers so received, and that the other branches of the government are bound to regard them as ministers, so long as the president continues to treat them as such. United States *v.* Ortega, 4 *Wash. C. C. Rep.* 536.

The power of receiving foreign ministers, delegated by the constitution to the president, might be in danger of being interfered with by the judicial branch of the government, and unhappy collisions between the state and federal governments might arise, if the law were otherwise. Foreign ministers might in vain appeal to the laws of nations to protect them in the enjoyment of their privileges and immunities, if, after being received and recognised by the highest constitutional authority, the president of the United States, they were to be obliged to submit the legality of these credentials, thus sanctioned, to every tribunal in the country, before which they might be brought by process. In conformity with these principles, it was decided in the case of the United States *v.* Liddell, cited by Judge Washington in Ortega's Case, that the certificate of the secretary of state of the United States that the person claiming to be chargé d'affaires was received and recognised as such by the executive of this government, was the best evidence which could be given of that fact ; that the only proper inquiry in cases of this sort is, Has the person claiming to be a foreign minister been received and recognised as such by the executive ? Governed by these principles, we consider the facts and documents certified by Mr Van Buren, as secretary of state, as the only evidence before the court that the defendant was received and recognised as chargé d'affaires of the kingdom of Portugal, and of the continuance or termination of his official and privileged character.

[His honour here gave a statement of the facts detailed in the certificate of the secretary of state, and then proceeded as follows :]

When the commission of an ambassador is at an end, when he has finished the business on which he came, is recalled, dismissed, or is obliged to go away on any account whatever, his functions cease, but his privileges and rights do not expire at the same time; he retains them till he returns to his principal, to whom he is to make a report of his embassy. *Vattel's L. N., b. 4, ch. 9, sect.* 125.

1.—2 x

[Torladé v. Barrozo.]

It is as a returning minister only that the defendant can claim privilege.    That claim of privilege appears to be resisted, substantially, on the following grounds.

1st.  That he had no credentials from Don Pedro IV.; his last credentials being from Donna Isabel Maria, the regent.

2d.  That if the defendant was lawfully accredited, received, and recognised, until the 18th of July 1828, his communication of that date, notifying our government that he ceased his diplomatic functions, connected with his subsequent declaration of the 3d of October that he continued to exercise his consular functions, deprived him of his diplomatic character from that time ; and that he is not entitled to the privileges of a returning minister.

3d.  That if entitled to the privileges of a returning minister from the 18th of July 1828, the delay to depart from that time until his arrest, on the 30th of October 1829, was more than necessary, was an unreasonable time, and he is not now entitled to privilege as such minister.

4th.  That Don Miguel I. is the constituent of the defendant ; that he is setting up his privilege against his constituent contrary to the principle on which it is founded ; that at all events the institution of this suit is a waiver of the defendant's privilege, by the existing chargé d'affaires of Portugal, which he had a right to make, if the defendant were otherwise entitled to the inviolability of a foreign minister.

This is an action of trover, brought by the plaintiff in his recognised character of chargé d'affaires of the kingdom of Portugal, against the defendant, who, in the language of his passport, " has long resided near the government of the United States in the character of chargé d'affaires of Portugal ;" and it appears, by the plaintiff's *affidavit* of his cause of action, dated the 30th of October 1829, to have been instituted for the recovery of the archives of the diplomatic mission, and other documents of great importance to the interests of the king of Portugal and certain of his subjects, which the plaintiff asserts of right belong to him in his official capacity, and which the defendant retains in his possession, and refused, on demand, to deliver to the plaintiff.

The difficulty existing between the respectable individuals who are parties to this action, grows out of the unhappy differences which have heretofore disturbed the Portuguese nation, and divided its royal family.    It has occasioned a discussion involving the rights of public

[Torladé v. Barrozo.]

ministers, not only highly interesting to the general diplomatic corps, as affecting their independence, particularly in revolutionary times, when it is most to be desired; but to the general jurist and statesman, as materially affecting the free and independent intercourse between sovereigns and nations.

1st point. The defendant, Mr Barrozo, appears to have been duly received and recognised by our government as chargé d'affaires under the old king, John VI., of Portugal; and shortly after his death (new credentials being required by the laws of nations in case of the death of his sovereign), on the 26th of March 1826, the princess Isabel Maria appointed him "*to the same office in which he was before,*" his credentials reciting the death of king John on the 10th of the same month, and the decree of the 6th constituting the regency. These new credentials were presented by the defendant on the 9th of June 1826, when he was duly recognised by the United States government. The princess regent and the nation, shortly after, recognised Don Pedro IV., by swearing to the constitution granted by him, and subsequently Don Miguel himself recognised that prince as his sovereign by assuming the regency in his brother's name, and the defendant as his brother's minister by communicating his letter through him to the president announcing the fact. The credentials of the defendant of 26th of March 1826 were, therefore, under Don Pedro IV., the sovereign acknowledged by the regent who granted them, and her successor, Don Miguel. It is, however, sufficient for us that the defendant was recognised in that character by our government, and treated with, by it, as the representative of Don Pedro.

2d and 3d points. The view of the case taken by the court, upon the 2d point, renders any discussion of the 3d unnecessary.

The functions of a minister in many cases cease upon the death of his own sovereign, or of him to whom he is sent; also by the termination of his mission in consequence of his having effected its object; his recall by his own government, or dismissal by that near which he resides; the moral death of his sovereign, or of him to whom he is sent, by abdication, whether it be voluntary, or forced by revolution, by essential changes in the form of one of the two interested states; and, when his functions do cease in any of these ways, or in any other way whatever, the minister still remains entitled to his privileges and immunities, under the laws of nations. *Martin's Manual Diplo-*

*matique,* 133, 134, 135, *ch.* 7, *sect.* 59.   " *De la maniere dont cessent les fonctions de l'agent diplomatique.*"    *Vattel, b.* 4, *sect.* 125, 126.

    The defendant, probably, feeling himself placed in a situation in which his functions cease, by the law of nations, in consequence of the disturbances in Portugal, appears, by his letter of the 18th of July 1828, to have done no more than to have communicated the intelligence to our government, in his official character of chargé d'affaires, and to have declined being the channel of communication between this government and that in Portugal, the recognition of which he regarded as alike opposed to his oath to support the constitution of his country, and his fidelity to the prince, whom he and Don Miguel had acknowledged as their king.    This step may be regarded as an evidence of frankness to our government, as it certainly was, of fidelity to Don Pedro.    His subsequent explanation and communications to our government; the answers to those communications, addressed to him in his official character; the circular of the 3d of March 1828, inviting him to attend the inauguration of the present president, assigning him a place among the diplomatic corps; the allowance of a passport, by the secretary of state, to enable him to return, describing him as having long resided near our government, as *chargé d'affaires of Portugal,* when the secretary certifies that from conversations with Mr Barrozo he understood it to be his intention to await the result of events at home; the decision of our government on the recognition of the plaintiff, the present diplomatic agent of Portugal; the demand of the passport, immediately on the occurrence of that recognition; and the delay, and refusal in fact, to grant the plaintiff an interview, from the time he first presented himself at the office of the secretary of state, on the 28th August 1828, to answer any communication, or to recognise him in any way, until he was verbally told, on the 1st of October 1829, that he would be received on the 2d, when he was recognised—are unequivocal acts of the defendant and of our government; showing the understanding of both parties, of the character of the communication of the 18th of July 1828, and that the defendant was, until the plaintiff's recognition, a public minister, exempted from the jurisdiction of our courts, and that the government of the United States regarded him as a returning minister, at the date of his passport, the 8th of October 1829.   Between this time and his arrest, the 30th of the same month, a reasonable time for his departure cannot be contended to have elapsed.

    The supreme court of the United States decided, in the case of

[Torladé v. Barrozo.]

Rose *v.* Himely, 4 *Cranch* 241, and Gelston *v.* Hoyt, 3 *Wheat.* 324, that it is the exclusive right of governments to acknowledge new states arising from revolutions, and until such recognition by our government, or that of the government to which the new state belonged, courts of justice are bound to consider the ancient state of things unaltered.   In analogy to those principles we must consider the ancient state of things as existing in Portugal until the 2d of October 1829, when Don Miguel was recognised as king of Portugal, by the reception of his minister.

The circumstance of the defendant's having, for the benefit of his countrymen, without injury to the right of his sovereign, or of our country, continued to exercise his consular functions while he was awaiting the pleasure of Don Pedro, the events at home, and the decision of our government with regard to the recognition of the plaintiff, is not open to the construction put upon it ; and, the immediate demand of his passport upon the recognition of the plaintiff, is strong evidence of his sincerity in the reasons assigned for his continuance in this country.

4th point.  The most interesting question which has been discussed is the fourth.   It is one on which we enter with great delicacy, for there are many powerful reasons why it should be exclusively referred to that branch of our government, on which by the constitution is imposed the duty of receiving foreign ministers.

If a sovereign or state receive under the public faith the minister of another sovereign or state, and afterwards deem it for the interest of the country or himself to receive and recognise another as the minister of a rival sovereign or party that may have obtained possession of the government of the foreign nation ; or, if such sovereign or state think proper to assert that another government exist *de facto*, or *de jure*, in the minister's country : is such received minister of the former recognised government or sovereign *ipso facto* stripped of his quality and privileges ?   Are his person, his property, and the archives of his mission, previously the property of his sovereign and government, subjected to the jurisdiction of the courts of justice of the country ?   The affirmative of these questions has been contended for, as the necessary result of the position, that the inviolability of foreign ministers is founded upon the general principle, that they represent their sovereign.   It is said in the case before the court, Don Miguel being the acknowledged king of Portugal, the defendant represents him, Don Miguel, and of course cannot assert the privi-

lege against his constituent. The institution of this suit is said to be evidence that Don Miguel claims the property in question, or at all events, that he has waived the privilege of the defendant through his authorized agent the plaintiff.

Supposing the rights of ambassadors to depend exclusively on the bold principle, which is certainly to be found at their root, that all foreign ministers representing more or less their constituents, usage invests them with a sanctity of character, attributes to them particular immunities and distinctions, and that all questions arising therefrom should be determined by that principle ; *Marten's Man. Dip., tit. De l'Inviolabilité* 43, *ch.* 3, *sect.* 20 ; does not the argument carry the doctrine to a great extent, when it is contended that the recognised minister of Don Pedro IV., by the mere fact of the president's receiving the plaintiff as Don Miguel's minister, became the representative of Don Miguel, and Don Miguel became his constituent; that the recognised minister of another government or sovereign, after coming to the country under the public faith, is stripped of his privileges under the law of nations, subjected in person and property to the mercy of the triumphant rival of his king, and within the jurisdiction of the country whose courts will be bound to aid the new minister or sovereign in pursuing any claim against his person, or the public or private property in his hands ?

Principles and authority are to be found in writers upon the law of nations, (*Vattel, b.* 4, *ch.* 7, 102 ; 2 *Grot. b.* 2, *ch.* 18, 400, 408 ; United States *v.* Hand, 2 *Wash. C. C. R.* 488), which seem to indicate a recognition either of personal rights as belonging to foreign ministers independently of their characters as representatives of their constituents, or that the legal relation existing between a diplomatic representative and his constituent is different from that contended for by the plaintiff.

A foreign minister is not to be ill used by way of reprisal; for a prince using violence against a public minister commits a crime which is not to be revenged by an imitation of it. The Carthaginians having violated the law of nations with regard to the Roman ambassadors, some of their ambassadors were brought to Scipio; and on being asked what he would have done to them ? he replied, " *Nothing that resembles what the Carthaginians have done to us,*" and sent them away in safety. The frequent occasions to be found in history where such agents have been respected under the law of nations, when their constituents would have been executed as rebels or traitors, had they

[Torladé v. Barrozo.]

been personally present, need only be suggested to strike the mind of the general reader. *Vattel* gives a remarkable instance of the respect due to a public minister, which is related of St Louis, when at Acre, in which there can be found little analogy with the principle of respect due to the constituent. An ambassador *from the Old Man of the Mountain, or prince of the assassins*, speaking violently to Louis, the grand master of the Knights Templars told him, " *that were it not for the respect due to his character, he would immediately cause him to be thrown into the sea.*" The king allowed him to depart without insult ; yet as the prince of the *assassins* had violated the most sacred laws of nations, no security seemed due to his minister, but this security was founded upon the necessity of sovereigns preserving the means of reciprocally communicating their proposals, and treating with each other in peace and war.

Another authority bearing a strong resemblance to the case before the court. De Wicquefort, *L'Ambassadeur, liv.* 1, 946. Christine, queen of Sweden, had acknowledged the king of Portugal, entered into an alliance with him, recognised his minister, and honoured him at the ceremony of her coronation ; some days however before her abdication, she thought proper to command her master of ceremonies to go to the minister of Portugal with a sealed note, with orders not to open it but in his presence, to read it to him and bring it back to her, with liberty to give him a copy if he desired one. The purport of the note was, that the queen acknowledging no other king of Portugal but Philip IV. king of Spain, made known to the minister resident of the duke of Braganza, the pretended king of Portugal, that his employment being useless at that court, he should retire, as in future she should only regard the duke, his master, as a usurper. *Nevertheless, as the minister had come to Sweden under the public faith, she would secure to him the enjoyment of the inviolable protection of the law of nations.* The minister continued to reside at Stockholm, to enjoy that protection, and re-entered on the execution of his functions under Charles Gustavus. It was not, says the author, in the power of the queen to deprive him of his quality.

When a civil war exists in a nation, the obligation of observing the laws of war is absolute and indispensable to both parties, and the same which the law of nations obliges all nations to observe between each other. Although foreign states will not interfere, as a general rule, in such quarrels, yet if a nation or sovereign thinks

[Torladé v. Barrazo.]

proper to do so, there is no law to prevent it; and having received and recognised the ambassador of one party, the same law of nations which regulates the intercourse between the rival factions or princes may not unfairly be presumed to apply so far to the intercourse between a foreign state and one of the parties, as to protect *a received minister*, within the jurisdiction of the government receiving him, in the privileges secured to diplomatic agents. *Vattel, b. 3, c.* 18, *sect.* 395.

The end and design of embassies render the privileges of ambassadors necessary; for if they can treat with the prince to whom they are sent with full independence, they will be much better qualified to perform their duty than if subjected to a foreign jurisdiction. *Burlamaqui's Pol. Law* 252, *vol.* 4, *ch.* 7, *sect.* 92.

If by any unforeseen event by which a minister's functions may be suspended or cease, some of which we have enumerated, including *dismissal* by the government or sovereign near which he resides, he ceased to enjoy on that account the exterritoriality or inviolability due to his character, it may well be questioned whether, in cases of danger arising from revolutions, or from the perfidious character of a particular sovereign, men of high standing would be willing to submit their fortunes and their persons to the changes and dangers of war, or the caprice or perfidy of such a monarch.

It has already been remarked that the court feel great delicacy in occupying the ground on which we have been treading during our discussion of the fourth point; and we have gone as far as we have, rather to show that the executive branch of our government, in granting the passport of a returning minister to the defendant, *intended* to do what they appear to have done by granting it, and that *the probability of such intention* is not contradicted by clear and established principles of the law of nations, as has been contended by the learned gentlemen of counsel for the plaintiff.

The omission of our government to invite the defendant on two occasions with the diplomatic corps, may have been caused by his absence from Washington, his residence being in Philadelphia, or by his having given the government to understand, that, until they decided upon the plaintiff's claims, he would prefer remaining in retirement upon occasions of ceremony.

The grounds of the judgment of the court are briefly these. We are satisfied that the defendant was received and recognized in a diplomatic character by our government; that he continued to be

[Torladé v. Barrozo.]

so recognised until the 2d of October 1829; that our government detained the plaintiff more than a year before he was received and recognised as the chargé d'affaires of Portugal; that the executive having given defendant a passport as a returning minister, must have so regarded him; that we have no evidence from our government that he was deprived of his privileges by Don Miguel, if that monarch had the power to do so, nor that Don Miguel authorized this suit; that the act of the plaintiff in bringing the suit in his own name, as chargé d'affaires of Portugal, does not, *ipso facto*, divest the defendant of the privileges attached to him as a returning minister, recognised by the president, and protected as such by the passport issued under the authority of the United States; and, consequently, that the defendant is entitled to his claim of privilege, under the laws of nations and the act of congress of the 30th of April 1790, and consequently to be discharged from the process issued against him.

Rule absolute. (*a*)

(*a*) The questions which were here involved, came up again in the circuit court of the United States for the district of Pennsylvania, on an indictment of Zalegman Philips, Esq. (the attorney who issued the writ of *capias ad respondendum* in the above case) under the act of April 30th, 1789, section 26. 1 *Story's Laws U. S.* 88. The indictment was tried before *Baldwin* and *Hopkinson*, justices, but the case was eventually sent to the supreme court of the United States, on a certificate of a division in opinion of the justices. During its pendency, by direction of the president of the United States, a *nolle prosequi* was entered in the circuit court, and the cause was dismissed in the supreme court. United States *v.* Phillips, 7 *Peters's S. C. Rep.* 776. Previous to the *nolle prosequi*, the chief justice of the United States had granted a writ of *ne exeat* against Barrozo (on the application of Torladé), which was not executed, he having left the country.